UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| Appolo Fuels, Inc., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | No.: 3:11-cv-00467-PLR-CCS |
| Claiborne Heavy Hauling, LLC, | ) | |
| Claiborne Contractors, LLC, | ) | |
| and Todd Claiborne, | ) | |
| all D/B/A Claiborne Contractors, | ) | |
| | ) | |
| *Defendants*. | ) | |

**Findings of Fact and Conclusions of Law**

This is an action for damages resulting from the alleged breach of a contract to perform surface coal mining in Bell County, Kentucky. After a stipulated setoff of $33,442.84, the plaintiff seeks $579,293.99 in damages, plus attorney fees and costs against the corporate defendants. The plaintiff also asks the Court to pierce the corporate veil and find defendant Todd Claiborne personally liable. The matter was tried before the undersigned on July 15-18, 2014. Having the heard the testimony at trial and having reviewed the record in this case, the following are the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

**Findings of Fact**

Plaintiff Appolo Fuels, Inc. (hereinafter "Appolo") is a Kentucky coal mining corporation. (TR.v.1 at 34). On July 24, 2009, Appolo entered into a three-year contract with a party identified as Claiborne Contractors. (Joint Ex. 3) (hereinafter "Contract"). The Contract was for surface mining and reclamation of a permitted surface coal mine identified in a Mining and Reclamation Resources Map (MRP Map) dated July 22, 2009. (Plaintiff's Ex. 5). Jellico #2

Permit No. 807-0365 allowed mining in an area depicted on the MRP Map generally referred to as the Jellico #2 site. (TR.v.1 at 64-65).

The Contract was executed by Salvador Gaudiano as Treasurer for Appolo, and Todd Claiborne as Chief Manager for Claiborne Contractors. (Joint Ex. 3). The Contract specifically acknowledges that Appolo was a "corporation organized and existing under the laws of the State of Kentucky." (Joint Ex. 3). The Contract is silent as to the legal structure or organization of Claiborne Contractors. (Joint Ex. 3).

The Contract required Claiborne Contractors to perform mining operations on the Jellico #2 site and to "reclaim and restore all surface areas disturbed by said mining operations to the extent required by any federal, state or local governmental agency having the power to regulate said operations up to and including all work necessary to release Phase III bonds relative to Contractor's mining operations." (Joint Ex.3, Article One, Section C). Additionally, Claiborne Contractors was to be "solely responsible, as its mining progresses, for any necessary reclamation and rehabilitation of all areas disturbed by Contractor, including without limitations, any necessary draining, grading, seeding and spoil disposal." (Joint Ex.3, Article Eleven).

Article Two of the Contract required Claiborne Contractors to deliver "clean Mineable Coal at a minimum average monthly rate of 10,000 tons, but in no event more than 40,000 tons or less than 10,000 tons per month." Article Five of the Contract governed warranties and risk as follows:

> Contractor accepts the Property in its existing condition. Appolo makes no implied or express warranty or representation concerning the existence, quantity, quality, mineability or merchantability of coal seams within the Property; however, Contractor is under no obligation to deliver coal under this Agreement to the extent its existence, quantity, quality, mineability or merchantability renders the mining requirements hereunder impossible or commercially infeasible. Contractor covenants and agrees that no representations, statements or warranties, expressed or implied, have been made by or on behalf of Appolo

regarding said coal lands, their condition, the use or occupation that may be made thereof of the income therefrom. Appolo shall in no event whatsoever assume or be liable for any loss incurred by the Contractor under this agreement. Appolo does not assume any responsibility or liability for the present or future condition of the Property and Appolo shall not be liable to Contractor for any damage to or destruction of the Property or Contractor's property or the property of any other person whomsoever due to fires, floods or any other accident or natural catastrophe which occurs on or within the Premises; provided, that if damage to or destruction of the Property renders mining operations impossible or commercially infeasible, then Contractor's obligation to deliver coal shall forthwith terminate.

Under the terms of Article Fourteen of the Contract, a problem that made it impossible or commercially infeasible for Claiborne Contractors to continue mining operations gave Claiborne Contractors the right to cease mining, but did not release them of the obligation to reclaim areas that have been disturbed by their previous work.

Article Ten of the Contract governs choice of law and states clearly that "this agreement shall in all respects be governed by and construed in accordance with the laws of the State of Kentucky including all matters of construction, validity and performance."

From July 24, 2009 through September 30, 2009, Claiborne Contractors mobilized, applied for permits, published notices, and prepared Jellico #2 to be mined. (TR.v.1 at 71). Claiborne Contractors began mining coal and made its first delivery of coal to Appolo on Wednesday, September 30, 2009. (TR.v.1 at 71, 73). Payment for this coal delivery was due on Friday, October 9, 2009, and Appolo timely made this payment. (Joint Ex.4; TR.v.1 at 69).

Claiborne Contractors mined coal on the Jellico #2 area from September 30, 2009, through January 14, 2010. (TR.v.1 at 73, 94; TR.v.2 at 96). Claiborne Contractors' work on the site was not very productive; it only met the minimum monthly amount of 10,000 tons of clean coal in one month. (Joint Exs. 6, 11; TR.v.2 at 97). In all the other months of mining, Claiborne Contractors failed to meet its required minimum coal amounts under the Contract. (Joint Exs.6, 11; TR.v.2 at 85, 97).

3

On January 14, 2010, a section of the highwall where Claiborne Contractors was mining separated and fell. (Joint Ex.57; TR.v.1 at 85-86; TR.v.3 at 50-51; TR.v.4 at 61). This separation and fall was variously described as a "collapse," a "slide" or a "cave in." (TR.v.1 at 86). It is undisputed that this slide was not caused by either party, but resulted from natural causes. (*Id.*). The financial impact of this highwall collapse was significant because all of the non-paying work done to uncover the coal was lost when the material fell from the wall. (TR.v.1 at 86-87).

January 14, 2010, was the last day Claiborne Contractors actively mined at the Jellico #2 site. (Joint Ex. 63). Adam Payne contacted Gary Asher, Appolo's president, shortly after the highwall collapse because he was concerned about how to proceed, and Mr. Asher met with Adam Payne on site. (TR.v.1 at 91-92). Mr. Asher requested that Claiborne Contractors continue to mine and told Mr. Payne that Claiborne Contractors could continue to mine if they mined the outside of the pit area. (*Id.*). When asked for more specifics, Mr. Asher suggested that Claiborne Contractors evaluate the possibility of mining on an area on the far side of the highwall collapse. (*Id,*). Adam Payne told Mr. Asher that "it wasn't feasible for us to mine" on the other side of the highwall collapse. (TR.v.4 at 87). Mr. Asher then requested that Claiborne Contractors evaluate mining on an area on the opposite side of the permitted area. (TR.v.1 at 92-93). Adam Payne also told Mr. Asher that Claiborne Contractors would not mine at the opposite side of the permitted area. (TR.v.4 at 87-88). Mr. Payne communicated to Mr. Asher that Claiborne Contractors was having substantial financial problems, that Claiborne Contractors would not mine further on Jellico #2, and that Claiborne Contractors had to have an incoming revenue stream from some other permit held by Appolo to perform reclamation on areas it had disturbed while mining on Jellico #2. (TR.v.4 at 78-79; TR.v.1 at 103). Mr. Payne communicated to Mr. Asher that Claiborne Contractors was "going to leave." (TR.v.1 at 104).

4

Payne then asked Gary Asher whether Claiborne Contractors could mine another permit known as Rich Mountain. (TR.v.4 at 12-13, 64). The Rich Mountain permit was permit number 807-0314 and was not originally included on the Contract. (Joint Ex.3; Plaintiff Ex.5; Joint Ex.54; TR.v.1 at 102; TR.v.3 at 47).

Gary Asher hoped that if he allowed Claiborne Contractors to mine Rich Mountain, they would have the funds to reclaim Jellico #2. (TR.v.1 at 104-05). Asher knew that if Claiborne Contractors did not reclaim Jellico #2, Appolo would be responsible for the reclamation. (*Id.*). For this reason, Appolo orally agreed to permit Claiborne Contractors to mine on Rich Mountain.

Claiborne Contractors first began work on Rich Mountain on January 19, 2010 – five days after the highwall collapse on Jellico #2. (Joint Ex.63; TR.v.4 at 65). Claiborne Contractors mined Rich Mountain for 17 days until February 11, when all work stopped on Rich Mountain. (Joint Exs.31, 63; TR.v.3 at 150-152). Claiborne Contractors did no work at all for the following eight days, and Claiborne Contractors laid off 18 employees on February 19, 2010, leaving only a five person "management team." (Joint Exs.13, 31, 63; TR.v.3 at 150-152; TR.v.4 at 81-83).

The five management team employees were retained to finish extracting coal from a pit that had already been opened. (TR.v.4 at 68-69, 83). This management team worked from March 1 until March 5 (Joint Exs.14, 15; TR.v.1 at 121-124) when Claiborne Contractors laid off all the remaining employees. (Joint Ex.13; TR.v.3 at 153-154). Despite being "laid off" from Claiborne Contractors, these five management employees were "transferred" to another company owned by Defendant Todd Claiborne. (*Id.*). The new employer for the five management team employees was nonparty Claiborne Hauling Contractors, LLC. (TR.v.3 at 153-154; TR.v.4 at 83).

5

Claiborne Contractors had performed no meaningful reclamation on Jellico #2 by the time they pulled off Rich Mountain. (TR.v.1 at 95, 118-119). The Kentucky Division of Mine Reclamation performed monthly inspections on November 19, 2009, December 17, 2009, and January 22, 2010. (Joint Exs. 7, 8, and 9). These inspections were memorialized on official Mine Inspection Reports. (*Id.*). The Mine Inspection Reports all documented that zero acres had been reclaimed by the dates the inspections were performed. (*Id.*). Scott Cox, the Kentucky regulator with the Division of Mine Reclamation, who signed off on each of these Mine Inspection Reports, confirmed that no reclamation had been performed by the time Claiborne Contractors abandoned the site. (TR.v.3 at 34-38, 76-77). Cox further testified that the highwall collapse was no justification for needing additional time to perform reclamation, and the collapse did not affect Claiborne Contractors' obligation to perform reclamation. (TR.v.3 at 52). The final Mine Inspection Report issued by Cox confirmed that as of March 25, 2010, over a month after Claiborne Contractors left the Rich Mountain site, zero of the 25 disturbed acres on Jellico #2 had been reclaimed. (Joint Ex.10; TR.v.3 at 34-39, 76-77; TR.v.1 at 101-102).

No mining took place on Rich Mountain over the 17 day period from February 11 through March 1. (Joint Ex.63). Appolo became aware that no work at all was happening on Rich Mountain, that no work was happening on reclaiming Jellico #2, and that no Claiborne Contractor employees were on either site. (Joint Ex.13; TR.v.1 at 117-19). Appolo further became aware that Claiborne Contractors had begun moving equipment off site. (TR.v.1 at 120). Gary Asher testified that, upon learning of the layoffs, he finally accepted the fact that Claiborne Contractors was not going to reclaim Jellico #2. (TR.v.1 at 119).

Sometime in March, 2010, Todd Claiborne and Adam Payne met with Gary Asher and Salvador Gaudiano. (TR.v.3 at 160; TR.v.4 at 46-47). During the meeting, Mr. Claiborne gave

6

his oral notice of contract termination to Appolo. (TR.v.3 at 160). As of this meeting, Claiborne Contractors had not performed any meaningful reclamation on Jellico #2. (Joint Ex.10; TR.v.3 at 34-36, 76-77).

Appolo subsequently performed a significant amount of the reclamation of Jellico #2. Appolo only reclaimed the areas disturbed by Claiborne Contractors, and Appolo only reclaimed to the extent required by the Division of Mine Reclamation. (Joint Ex.53; TR.v.3 at 41-44; TR.v.1 at 127-131; TR.v.2 at 26-28.). Appolo began the reclamation work because the deadline to perform reclamation was approaching and the Division of Mine Reclamation was "urging them to start something, to initiate some kind of activity. [The Inspector] knew the time was getting near." (TR.v.3 at 76).

Upon beginning work on reclamation, Salvador Gaudiano instructed Appolo's onsite workers to preserve records of employee time, time spent using equipment by the hour, fuel costs, equipment repair costs, security costs, and hydroseeding costs. (TR.v.2 at 112-114). Appolo used its own equipment on the reclamation work at Jellico #2, but determined a cost for such use by multiplying the hours of use for each piece of equipment by the hourly rental rate for such equipment provided by Stowers Cat, an equipment rental company located in Knoxville. (Joint Ex.17; TR.v.2 at 113-14). Mr. Gaudiano further testified that he did not use the full rental rates on the equipment from the Stowers' quote, which would normally have required a six-month contract and would have resulted in equipment costs of over $900,000. (Joint Ex.17; TR.v.2 at 159-160). Instead, Appolo used the per hour rate for such equipment based upon actual usage on the reclamation site. (TR.v.2 at 113-14).

Appolo incurred the following costs for the reclamation:

(1)  $288,516.25 -- equipment cost;

(2)  $110,503.97 -- employee cost;

(3)  $67,263.34 -- fuel cost;

(4)  $28,216.50 -- equipment repair cost;

(5)  $27,352.75 -- security;

(6)  $5,800.00 -- hydroseeding.

(7)  $85,084.02 -- interest

Total Reclamation Costs = $612,736.83. (Plaintiff Ex.3; Joint Ex.20; TR.v.2 at 117-142, TR.v.3 at 5-8).

Defendants contend that the amount of damages claimed by Appolo for reclamation work was not reasonable. However, Mr. Claiborne acknowledged at trial that he had no way to dispute the amount of work performed by Appolo and offered no other evidence that the costs incurred by Appolo were excessive. (TR.v. 3 at 164-165).

Even after Claiborne Contractors stopped working on Jellico #2 and at Rich Mountain, Appolo continued to operate the highwall miner on Jellico #2. (TR.v.1 at 109-110). Pursuant to its obligation under the Contract, Appolo paid Claiborne Contractors the full payment for the Jellico #2 highwall miner coal for the month of January on February 5, 2010. (Joint Ex.11; TR.v.1 at 109-110). Thereafter, Appolo withheld the defendants' share of the monies owed from the highwall miner coal. The amount Appolo ultimately withheld was $33,442.84. (Joint Ex. 16).

The money paid from Appolo to Claiborne Contractors for the Jellico #2 and Rich Mountian work was deposited into a banking account at Mountain Commerce Bank. (TR.v.3 at

8

120-121, 134-136; Joint Ex. 65). The account was opened on August 28, 2009—one month after the Contract was signed and two months before Claiborne Contractors, LLC was registered with the state of Tennessee (TR.v.3 at 101). The account was opened in the name of "Claiborne Heavy Hauling, LLC Claiborne Contractors." (Joint Ex. 65). The name "Claiborne Contractors, LLC" is nowhere on the account records. (*Id.*). The name printed on the checks is simply "Claiborne Contractors." (Joint Ex. 65). Joint Ex. 65 contains the bank records for all activity in the Mountain Commerce Bank account from August 28, 2009 until March 31, 2010. (TR.v.134-136).

Joint Exs. 6, 11, 12 and 14 contain copies of all of the checks written from Appolo to Claiborne Contractors between July, 2009 and March, 2010. (TR.v.2 at 75-93; TR.v.1 at 106-111; 113-117; 120-124). A comparison of those exhibits with Joint Ex. 65 reveals that all of the funds paid by Appolo except the first $12,000 check written on October 9, 2010 were deposited into the account at Mountain Commerce Bank, whose records are collected in Joint Ex. 65.

Despite Todd Claiborne's testimony (TR.v.3 at 120-123, 134-135) that the work for Appolo was the only source of income for Claiborne Contractors, LLC during its existence, Joint Ex. 65 also reveals numerous other deposits into the Mountain Commerce account. The deposits are designated "remote deposits." Some indicate that the deposits are from Todd Claiborne or other Claiborne entities (Joint Ex. 65 at Bates 1052, 1055, 1066, 1074, and 1097). Other deposits are simply identified as "remote deposits" with no indication of the source of the funds. (Joint Ex. 65). Joint Ex. 65 also reveals numerous electronic transfers of funds totaling $105,027.33 from the account to other Claiborne entities. (Joint Ex. 65 at Bates 1048, 1052, 1053, 1055, 1056). Joint Ex. 65 also reveals electronic debits to "Caterpillar" totaling $22,272.31 (Joint Ex. 65 at Bates 1048 and 1056) despite Mr. Claiborne's testimony that neither

9

Claiborne Contractors, LLC or Claiborne Heavy Hauling, LLC owned or leased any equipment. (TR. v.3 at 80).

Joint Ex. 65 also reveals electronic debits totaling $92,922.22 that do not indicate the reason for the transfer, but note simply that they were telephone or in person transfers. (Joint Ex. 65 at Bates 1052 and 1075). The electronic transfers are in addition to numerous checks written from the Claiborne Contractors account to other Claiborne entities and checks written from that account to the "Chapter 13 Trustee" and "Tenn Child Support." The record provides no explanation whatsoever for why a company that had only been in operation for a few weeks would be making payments to a Chapter 13 Bankruptcy Trustee or to the State of Tennessee for child support. (Joint Ex.65). The record as a whole clearly establishes that money flowed through this account from sources that had nothing whatsoever to do with the performance of the Contract and that the account was being used by Todd Claiborne to move money to and through his other business entities and for other apparently personal reasons. In fact, Mr. Claiborne admitted in trial that he exercised his discretion during the time relevant to the Contract between July 2009 and March 2010 to direct payments totaling at least $1,211,039.54 to other entities he owned. (TR.v.3. at 203-06; Joint Ex. 49).

The bank records also clearly establish that at the end of work at Rich Mountain, funds were being rapidly transferred out of the Claiborne Contractors account at Mountain Commerce Bank. On February 19, 2010, the Claiborne Contractors' bank account had a balance of $81,158.19, but on February 23, 2010, Todd Claiborne directed Claiborne Contractors to pay $70,000 to another of his companies, Bulldog Leasing, Inc. (Joint Ex.65; TR.v.3 at 150). By February 26, the balance in Claiborne Contractors' bank account was $2,405.97. (Joint Ex.65).

10

On March 5, the date of the final layoff, the balance of funds in the Claiborne Contractors bank account was $164.17. (Joint Ex.65; TR.v.3 at 155-156).

Defendant Todd Claiborne was the sole owner of the two named corporate Defendants in this matter (Claiborne Heavy Hauling, LLC and Claiborne Contractors, LLC) (TR.v.3 at 78). He was also the sole owner of Bulldog Leasing Company, Inc.; Claiborne Hauling Contractors, LLC; American Sand Company, LLC; TLC Truck Repair, LLC; Heavy Haul, LLC; Claiborne Hauling, LLC; and Tennessee Valley Aggregates, LLC. (Joint Ex. 21). All of Mr. Claiborne's companies operated out of one office on Rutledge Pike in Knoxville except for the sand mine in Monterey, Tennessee, and Mr. Claiborne personally owns the building in Knoxville. (TR. v.3 at 202-203). None of his companies had a written lease with Mr. Claiborne. (TR. v.3 at 203). During the time that Claiborne Contractors operated under the Contract, it was using equipment owned by Bulldog Leasing Company, Inc. (Joint Ex.21; TR.v.3 at 80, 156-157). Claiborne Contractors had no written contract with Bulldog Leasing establishing term or rates for leasing the equipment, and Todd Claiborne would use his discretion to set the rates or to collect or waive the lease payments. (TR.v.3 at 80-82, 122-123, 150, 156-157, 176-178).

Defendant Todd Claiborne's testimony about his various business entities and their involvement in the Jellico #2 project was confusing and frequently inconsistent with other evidence in the record. He testified that Defendant Claiborne Contractors, LLC was the company formed solely to perform the work under the July 2009 Contract. (TR.v.3 at 100, 104). However, defendant Claiborne Contractors, LLC was not formed until October, 2009 three months after the Contract had been executed and after work had begun on the site. (TR.v.3 at 101). With regard to the corporate structure, Todd Claiborne could not remember if he ever made a capital contribution when he formed Claiborne Contractors, LLC. (TR.v.3 at 186). He also admitted

11

that there was never an operating agreement for Claiborne Contractors, LLC, that there were never any meetings of members, and that no corporate formalities were observed. (*Id.*). Mr. Claiborne also admitted that because he was the sole owner of Claiborne Contractors, LLC, he personally determined what would happen. (TR.v.3 at 187). His personal tax return for 2009 reflects that Claiborne Contractors was a sole proprietorship owned by Todd Claiborne. (Joint Ex. 25).

Mr. Claiborne testified that despite the fact that he had formed Defendant Claiborne Contractors, LLC solely to do the job, they "ended up doing the contract under Claiborne Heavy Hauling, D/B/A Claiborne Contractors" (TR.v.3 at 101) and that Claiborne Contractors LLC never did anything on the job because it was never "completely set up." (TR.v.3 at 105). Mr. Claiborne acknowledged that he looked at Claiborne Heavy Hauling, LLC and Claiborne Contractors, LLC as "one and the same." (TR.v.3 at 198).

In fact, Claiborne Contractors, LLC was never authorized to mine in the State of Kentucky. (Joint Ex. 2). Claiborne Heavy Hauling, LLC was formed in Tennessee in February, 2007 (Joint Ex. 47), but was never registered in the State of Kentucky. (Joint Ex. 43). Claiborne Heavy Hauling, LLC filed a Certificate of Assumed Name in Kentucky on September 9, 2009 indicating that as a Tennessee Limited Liability Co., it was doing business in Kentucky under the name of Claiborne Contractors. (Joint Ex. 46).

The employees who worked on the project were employees of Claiborne Heavy Hauling, LLC. (TR.v.3 at 122). The equipment used on the site was owned by another corporation owned by Todd Claiborne—Bulldog Leasing. (TR.v.3 at 80, 122). Both Claiborne Contractors, LLC and Claiborne Heavy Hauling LLC have since been allowed to dissolve and are no longer doing business. (TR.v.3 at 170).

Although Claiborne Heavy Hauling, LLC generated gross income of $2,643,963 in 2009, (Joint Ex. 25), none of this business was done using written contracts or documentation between the entities. (TR.v.3 at 199). When Defendant Claiborne Heavy Hauling, LLC stopped doing business, Todd Claiborne did not cease the business of hauling heavy equipment and other materials; instead, he simply created a new entity to do the same business. (*Id.*).

Because of the oral nature of the business dealings between his related companies including the entity Defendants, Todd Claiborne could and would use his discretion and judgment as to which creditors to pay when the bills exceeded revenues for his companies. (TR.v.3 at 185-87). Mr. Claiborne would sometimes use personal funds or funds of his other companies to pay the debts of Defendants Claiborne Contractors, LLC and Claiborne Heavy Hauling, LLC. (*Id.*). Mr. Claiborne further testified that, when these businesses stopped doing business, that "I'm sure there was – I'm sure, in – especially Claiborne Contractors, there was money that didn't get paid back to some of the other companies." (*Id.* at 185).

## CONCLUSIONS OF LAW

### A. Breach of Contract

Article Ten of the Contract states clearly that all issues relating to the "construction, validity and performance" of the contract shall be governed by Kentucky law. "Under Kentucky law, in order to recover in any action based on a breach of contract, a plaintiff must show the existence and the breach of a contractually imposed duty." *Lenning v. Commercial Union Ins.Co.,* 260 F.3d 574, 581 (6th Cir. 2001) (quoting *Strong v. Louisville & Nashville R. Co.,* 43 S.W. 2d 11, 13 (Ky. 1931); *see also Barnett v. Mercy Partners—Lourdes, Inc.*, 233 S. W. 3d 723, 727 (Ky. Ct. App. 2007). In this case, the Defendants had a clear duty to reclaim the land at the Jellico #2 site, regardless of their ability to continue to mine at Jellico #2 site or at any other

13

location. The Defendants clearly failed to reclaim the mined area from January, 2010, forward. Accordingly, the Defendants breached their contractually imposed duty to the Plaintiff.

The Court further finds that Defendants' claims that the Plaintiff rescinded or repudiated the contract or that the Plaintiff entered into a new or amended contract to provide permitted areas to mine on Rich Mountain or some other location are not persuasive.

### B. Damages for Breach

The measure for damages for breach of contract is "that sum which will put the injured party into the same position he would have been in had the contract been performed." *Hogan v. Long,* 922 S.W. 2d 368, 371 (Ky. 1995) (quoting *Perkins Motors, Inc. v. Autotruck Fed. Credit Union,* 607 S.W. 2d 429, 430 (Ky. Ct. App. 1980)). Although reclamation costs in coal mining can be high, a court must enforce a contract as agreed by the parties. *See, e.g. Kirchdorfer, v. Watkins,* 248 S.W. 251, 252 (Ky. App. 1923) (holding that contracts are to be enforced as written). "Where a [mining] lessee fails to perform certain restorative work at the end of the lease period, the measure of damages in an action by the lessor for breach of contract is ordinarily the reasonable cost of performance of work although the restoration expense is extremely high." 53A Am. Jur. 2d *Mines and Minerals,* § 395 (2012).

In this case, the proof from the Plaintiff establishes that the cost of reclamation with prejudgment interest through June, 2014 was $612,736.83. The Defendants failed to provide any evidence that these costs were unreasonable or excessive. In the absence of alternative proof, the Court finds that damages of $612,736.83 are reasonable and will put the Plaintiff into the same position it would otherwise have been absent the breach by the Defendants. By stipulation of the Plaintiff, the amount of $33,442.84 (the amount of payments withheld for highwall miner coal)

14

will be credited against that amount. The Plaintiff is therefore awarded damages against the Defendants in the net amount of $579,293.99.

### C. Personal Liability of Todd Claiborne

The issue of the personal liability of Todd Claiborne will be governed by Tennessee law, although in reality, the standards are the same under both Tennessee and Kentucky law. The contract is completely silent as to the corporate structure of Claiborne Contractors. Todd Claiborne signed the contract as chief manager of Claiborne Contractors. At the time of the execution of the contract, there was no corporate entity in either state known as Claiborne Contractors. Todd Claiborne's tax returns for the year 2009 clearly reflect that Claiborne Contractors was a sole proprietorship generating income reported personally by Todd Claiborne. Regardless of what Mr. Claiborne's intent was at the time he executed the contract, there is no reference to Claiborne Heavy Hauling, LLC or Claiborne Contractors, LLC in the contract. Claiborne Contractors, LLC had not even been formed at the time of the execution of the contract and neither Claiborne Contractors, LLC or Claiborne Heavy Hauling, LLC were ever registered to do business in the state of Kentucky. As evidenced by Todd Claiborne's testimony at trial, there was never a separate corporate entity validly created to perform the contract. Further, by his own admission, the entity he intended to perform the contract was Claiborne Contractors LLC, but they "ended up doing the work as Claiborne Heavy Hauling LLC", an entity that was definitely never identified to the Plaintiff.

"In order for an agent to avoid personal liability on a contract negotiated on behalf of the agency's principal, 'the agent must disclose not only the fact of the agency, but also the identity of the principal.'" *ICG Link, Inc. v. Steen,* 363 S.W.3d 533, 550 (Tenn. Ct. App. 2011) (quoting *Siler v. Perkins,* 126 Tenn. 380, 149 S.W. 1060 (Tenn. 1912); *Remote Woodyards, LLC v.*

15

*Neisler,* 340 S.W. 3d 411, 417 (Tenn. App. 2009)). The Court finds that Mr. Claiborne has failed to establish that a principal existed at the time of the execution of the contract for which he could be a properly designated agent.

Moreover, to the extent Todd Claiborne believed he was insulating himself from personal liability by performing this work through either of the named corporate entities, his failure to comply with basic corporate formalities and to maintain separation between his many businesses requires the Court to pierce the corporate veils of the entity Defendants and assess personal liability to Mr. Claiborne. The factors set forth in *Federal Deposit Ins. Corp. v. Allen*, 584 F.Supp. 386, 397 (E.D. Tenn. 1984), govern whether the Court should permit piercing of the corporate or LLC veil:

1. whether there was a failure to collect paid in capital;
2. whether the corporation was grossly undercapitalized;
3. the non-issuance of stock certifications;
4. the sole ownership of stock by one individual;
5. the use of the same office or business location;
6. the employment of the same employees or attorneys;
7. the use of the corporation as an instrumentality or business conduit for an individual or another corporation;
8. the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another;
9. the use of the corporation as a subterfuge in illegal transactions;
10. the formation and use of the corporation to transfer to it the existing liability of another person or entity; and
11. the failure to maintain arm's length relationships among related entities.

No one factor is conclusive in determining whether to pierce the veil; instead courts consider a combination of the factors. *Pamperin v. Streamline Mfg. Inc.*, 276 S.W. 3d 428, 438 (Tenn. Ct. App. 2008).

Mr. Claiborne could not remember ever making a capital contribution to Claiborne Contractors LLC. No stock certificates were ever issued, no corporate meetings were conducted, and no corporate formalities were observed. Employees working on the site were employees of

Claiborne Heavy Hauling LLC, not Claiborne Contractors LLC. Mr. Claiborne was the sole owner of many entities during the relevant time period, including the two named Defendants. All of Mr. Claiborne's companies except the sand mine operated out of the same business location with no rent being paid to Mr. Claiborne. Funds were transferred among his many entities solely at his discretion. No operating agreements existed between the businesses and no leases existed for the rental of the equipment owned by Bulldog Leasing. The Claiborne Contractors bank account was used as a conduit to transfer funds to and from other Todd Claiborne businesses. Funds were being diverted from that account to the detriment of the Plaintiff and other creditors. There was a complete and total failure on the part of Todd Claiborne and his companies to maintain arm's length relationships among his related entities. Thus, the Defendants have failed to meet nearly all the factors set forth in *Federal Deposit Ins. Corp. v. Allen, Id.*, and the Court specifically finds that the circumstances of this situation produce such an inequitable result that it is compelled to pierce the corporate veils of Claiborne Contractors, LLC and Claiborne Heavy Hauling, LLC.

Accordingly, for all the reasons stated above, Todd Claiborne is liable individually to the Plaintiff for the damages awarded in this case.

### D. <u>Conclusion</u>

Based on these findings of fact and conclusions of law, the Court will enter judgment against the defendants, including Todd Claiborne, in favor of Appolo Fuels, Inc. in the amount of $579,293.99 plus a reasonable amount for costs and attorneys' fees incurred by the plaintiff, the amount of which will be determined by the Court in a separate order. The plaintiff is **ORDERED** to file a memorandum and exhibits evidencing the amount of costs and attorneys' fees incurred in this action within 30 days of the entry of this order. The defendants shall have

14 days to respond to the plaintiffs' position. A judgment consistent with these findings of fact and conclusions of law will be entered separately.

**IT IS ORDERED.**

_____
**UNITED STATES DISTRICT JUDGE**